UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mayo Clinic, | ) |
| Plaintiff, | ) Case No.: 0:21-cv-00693-JRT-DTS |
| v. | ) **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Jeffrey Lee Kittle, KPG Corp. f/k/a HKP Corp., HKP Corp. Group Benefit Plan, Group & Pension Administrators, Inc., MultiPlan, Inc. | ) |
| Defendants. | ) |

Plaintiff, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), submits the following First Amended Complaint against the above-named Defendants, and complains and alleges as follows:

**PARTIES**

1. Plaintiff Mayo Clinic ("Mayo") is a Minnesota non-profit corporation, with a principal place of business located at 200 1st Street S.W., Rochester, MN 55905.

2. Defendant Jeffrey Lee Kittle ("Kittle") is a citizen of Indiana, residing at 5720 Sunset Lane, Indianapolis, IN 46228.

3. Defendant KPG Corp., f/k/a HKP Corp. ("KPG"), is an Indiana for-profit corporation with a principal place of business located at 310 East 96th Street, Suite 400, Indianapolis, IN 46240.

1

4. Defendant HKP Corp. Group Benefit Plan ("Plan") is, upon information and belief, a self-funded employer and employee group health benefit plan maintained by KPG for the benefit of its officers and employees and is governed by the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et. seq.*

5. Defendant Group and Pension Administrators, Inc. ("GPA") is a Texas registered corporation with a principal place of business located at 12770 Merit Drive, Suite 200, Dallas, TX 75251.

6. Defendant MultiPlan, Inc. ("MultiPlan") is a New York registered corporation, with a principal place of business located at 115 5th Avenue, 7th Floor, New York, NY 10003.

## JURISDICTION

7. Jurisdiction is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1332(a)(1) based upon the diversity of the parties and the amount in controversy exceeding $75,000.00.

## FACTS

1. Kittle was a covered individual under the Plan maintained by KPG for the benefit of its officers and employees at all times relevant to this action.

2. As such, Kittle was, again at all times relevant to this action, a participant and beneficiary under said Plan and thus "covered" under the same.

3. Upon information and belief, the Plan was sold and issued to KPG by ELAP Services, LLC ("ELAP").

2

4. Upon information and belief, ELAP acts as a fiduciary for the Plan, making coverage determinations and payment decisions on claims submitted to the Plan for health care goods and services provided to Plan participants and beneficiaries.

5. GPA acts as the Third-Party Administrator ("TPA") and agent for the Plan, and is the entity to which claims are submitted by health care providers for health care goods and services provided to Plan participants and beneficiaries.

6. GPA is also the entity that issues payment and Explanations of Benefits to providers on claims submitted to it for health care goods and services provided to Plan participants and beneficiaries.

7. Upon information and belief, at the direction of ELAP and GPA, the Plan intentionally underpays hospital claims based upon a Medicare reference-based pricing model; wherein, instead of paying a set contractual amount as required, the Plan audits health care provider claims and pays a certain percentage above Medicare as reimbursement to the provider.

8. Subsequently, when the provider, such as Mayo in this instance, bills the patient for the remaining balance due and owing for the health care services provided under the terms of the contract signed between the provider and the patient, ELAP and GPA intervene and arrange for, provide, select, pay for and instruct their attorneys from FisherBroyles, LLP to defend the patient against the bill due and owing to the provider.

9. Kittle is the President, and, upon information and belief, the sole owner and shareholder of KPG.

10.    As such, Kittle knew or should have known the terms of the Plan that his company purchased from ELAP for the benefit of himself, his officers and his employees and the fact that the Plan reimburses hospital claims based on a Medicare reference-based pricing model.

11.    Kittle therefore also knew or should have known that the Medicare reference-based pricing model used by the Plan would have the potential of leaving KPG's officers and employees, including himself, with large outstanding hospital bills that were not paid for by the Plan.

12.    Kittle, as the President of KPG, also knew or should have known that as part of the services provided to KPG from ELAP and GPA, legal representation would be provided to KPG's officers and employees, including himself, in order to refuse payment upon and dispute any balances that were billed as patient liability by providers of health care goods and services.

13.    With this knowledge, Kittle specifically sought out and received in-patient medical and surgical services from Mayo to treat a serious medical condition that required hospitalization and other health care and goods and services from June 28, 2018 through June 29, 2018.

14.    Mayo obtained authorization from GPA for the health care goods and services to be provided during these dates.

15.    Kittle then again specifically sought out and received out-patient therapy and treatment from Mayo to treat a serious medical condition that required health care goods and services from January 8, 2019 through March 21, 2019.

16.     Mayo also obtained authorization from GPA for the health care goods and services to be provided during the majority of these dates.

17.     Prior to receiving the health care goods and services on all dates cited above, Kittle signed a Mayo Clinic Authorization and Services Terms form ("Authorization") wherein he represented and agreed that he was "responsible for all charges for services provided, including any amount not paid by [his] health care plan(s) . . . ."

18.     Said Authorization also assigned to Mayo any right Kittle possessed to have all covered expenses of the health care goods and services provided to him paid for by the Plan.

19.     Kittle signed this Authorization, guaranteeing his payment and personal obligation to Mayo for the health care goods and services he was to receive, with the knowledge that his representation was false, as the Plan would significantly underpay Mayo for the health care goods and services provided to him, that as a result of the Plan's underpayment he would incur a large patient liability balance, and that ELAP and GPA would then arrange for his legal representation to dispute the bill due and owing to Mayo.

20.     As such, Kittle signed the Authorization promising to pay, again with the knowledge that this representation was false as he had no intention to fully pay for the health care goods and services he would be receiving.

21.     Kittle's representation that he would pay Mayo, when he knew he had no such intention, concerned a material fact regarding the bargain between the parties and was made by Kittle personally as an individual who knew of its falsity.

22. Kittle signed the Authorization promising to pay in order to induce Mayo to provide him with the health care goods and services he specifically sought out and requested from it.

23. Mayo relied on Kittle's promise and representation that he would pay for all charges associated with the health care goods and services provided to him that were not paid for by the Plan when it agreed to and provided health care goods and services to him.

24. Also prior to receiving any health care goods and services from Mayo, Kittle had the opportunity to request and be provided with an estimate from Mayo for the charges associated with the health care goods and services he was to receive.

25. Such a request would have enabled Kittle to determine what the Plan would pay Mayo for the health care goods and services, and what his estimated personal responsibility would be.

26. Kittle failed to request any such estimate from Mayo.

27. Moreover, the charges associated with the therapy health care goods and services provided to Kittle from January 8, 2019 through March 21, 2019, which make up the majority of the balance alleged to be due and owing to Mayo, including the specific CPT codes associated with said health care good and services, were publicly available via Mayo's Chargemaster, which is published on Mayo's website.

28. As such, Mayo fully disclosed to Kittle the costs associated with the health care goods and services that were to be provided to him prior to his receiving the same.

29.    GPA, acting as the TPA and agent for the Plan, accessed the MultiPlan direct Provider Agreement ("Agreement") with Mayo in order for Kittle and the Plan to receive MultiPlan's contracted fee schedule rate with Mayo and in-network access to Mayo's services for Kittle.

30.    Pursuant to the terms of the Agreement between MultiPlan and Mayo, Mayo agreed to provide health care goods and services to Kittle in exchange for the Plan's prompt payment on the claims submitted to it by Mayo at the Agreement's contract rate of 95% of billed charges for both physician and hospital services.

31.    Also pursuant to the Agreement, MultiPlan is obligated to assure that its clients, such as GPA, which it allows to access Mayo through the Agreement, pay in accordance with said Agreement within thirty (30) days of submission of a clean claim by Mayo.

32.    Further, MultiPlan is obligated to contract with its clients, such as GPA, to ensure that payment is made in accordance with and at the rates set forth in the Agreement.

33.    Finally, if a claim is not paid in accordance with and at the rates set forth in the Agreement, Mayo is free to pursue its billed charges, less any payment made, and may pursue any additional rights or remedies to which it is entitled under Minnesota law including, but not limited to, interest payments.

34.    As stated, Mayo provided health care goods and services to Kittle from June 28, 2018 through June 29, 2018 and January 8, 2019 through March 21, 2019.

35.    Mayo submitted claims to GPA for the health care goods and services provided to Kittle.

7

36. Upon information and belief, GPA and the Plan paid Mayo at the 95% of billed charges Agreement rate for physician services, but failed to pay Mayo at the 95% rate for the hospital services associated with the health care goods and services provided to Kittle.

37. Instead, GPA and the Plan performed an audit of Mayo's hospital charges, and, as a result of said audit, underpaid Mayo in the amount of $233,397.63 pursuant to the Plan's Medicare reference-based pricing model.

38. The type of audit performed by Defendants is strictly prohibited by the terms of the Agreement.

39. Upon information and belief, GPA and the Plan assert that they are contracted through MultiPlan for physician services only and not for hospital services.

40. This is incorrect; the Agreement calls for reimbursement to Mayo from MultiPlan clients, such as GPA, at the 95% of billed charges Agreement rate for both physician and hospital services; MultiPlan cannot sell and a client cannot purchase only partial or physician network access.

41. Mayo brings this action against Kittle pursuant to the signed Authorization, and Kittle's intentional breach of his contractual obligation to pay Mayo for all charges associated with the health care goods and services he received that were not paid for by the Plan.

42. Mayo brings this action against KPG, the Plan and GPA pursuant to the terms of the Agreement, accessed by KPG, the Plan and GPA, and their corresponding failure to pay Mayo for the health care goods and services provided to Kittle in accordance with the terms of the Agreement, as well as their impermissible audit of Mayo's hospital charges in

contravention of the terms of the Agreement.

43. Mayo brings this action against MultiPlan pursuant to the terms of the Agreement, and MultiPlan's failure to contract with or ensure that its client, GPA, process claims and facilitate payment to Mayo from the Plan for the health care goods and services provided to Kittle in accordance with the terms of the Agreement.

44. As Defendants have failed to pay in accordance with the Authorization and Agreement, there remains an outstanding balance due and owing to Mayo for the health care goods and services provided to Kittle in the amount of $233,397.63.

45. Mayo has demanded payment of the unpaid balance from Defendants, but Defendants have refused to pay.

46. Defendants' refusal to pay has forced Plaintiff to retain the services of D.S. Erickson & Associates, PLLC and Plaintiff will incur attorney fee expenses and costs to recover the amount due and owing.

## CLAIM I
## BREACH OF CONTRACT

47. Plaintiff incorporates each and every allegation contained in Paragraphs 1-46, inclusive, with the same force and effect as if fully set forth herein.

*Against Kittle*

48. Kittle signed Mayo's Authorization, agreeing to be contractually liable for payment to Mayo on any and all charges for the health care goods and services provided to him that were not paid by the Plan.

49. Mayo then provided valuable health care goods and services to Kittle.

50. Mayo submitted claims to the Plan, through GPA, and the $233,397.63 claimed due and owing to Mayo is the amount remaining after payment by the Plan for the health care goods and services provided to Kittle by Mayo.

51. As such, under the terms of the Authorization Kittle is liable to Mayo in the amount of $233,397.63.

52. Mayo billed Kittle accordingly, but Kittle has refused to pay.

53. Kittle has breached the contract between himself and Mayo by failing to pay Mayo for the health care goods and services provided to him.

54. As a result of Kittle's breach, Mayo has and will incur damages in the amount of $233,397.63.

*Against KPG, the Plan, GPA*

55. Under and through the terms of the Agreement, KPG, the Plan and GPA accepted the contractual obligation and responsibility to timely and properly pay claims received from Mayo for the health care goods and services provided to Kittle at the 95% of billed charges Agreement rate for both physician and hospital services.

56. Claims for the health care goods and services provided were properly and timely submitted by Mayo to KPG, the Plan and GPA for payment.

57. KPG, the Plan and GPA's payment of only the physician services and corresponding charges at the 95% rate, but their refusal to pay for the hospital services and corresponding charges at the same rate constitutes a breach of contract.

58. Moreover, KPG, the Plan and GPA's impermissible audit of Mayo's hospital charges in contravention of the terms of the Agreement constitutes a breach of contract.

59. As a result of KPG, the Plan and GPA' breach, Plaintiff has and will incur damages in the amount of $233,397.63.

*Against MultiPlan*

60. Under and through the terms of the Agreement, MultiPlan had a contractual obligation to contract with and assure that GPA and the Plan would pay Mayo in accordance with the Agreement for the health care goods and services provided to Kittle at the 95% of billed charges Agreement rate on both physician and hospital services.

61. Moreover, MultiPlan had a contractual obligation to contract with GPA so that GPA would abide by Mayo's Third-Party Audit Policy.

62. MultiPlan's failure to contract with GPA and ensure GPA's processing and payment to Mayo on the claims submitted for the health care goods and services provided Kittle constitutes a breach of contract by MultiPlan.

63. As a result of MultiPlan's breach, Plaintiff has and will incur damages in the amount of $233,397.63.

## CLAIM II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

64. Plaintiff incorporates each and every allegation contained in Paragraphs 1-63, inclusive, with the same force and effect as if fully set forth herein.

*Against Kittle*

65. Kittle's refusal to pay Mayo for the health care goods and services he received, despite his contractual obligation to do so, constitutes a breach of the covenant of good faith and fair dealing.

66. Kittle knew or should have known the terms of the Plan prior to receiving health care goods and services from Mayo, and his signing of the Authorization when he had no intention to pay Mayo constitutes a breach of the covenant of good faith and fair dealing.

*Against KPG, the Plan and GPA*

67. KPG, the Plan and GPA's failure to diligently and timely monitor the claims submitted by Mayo and payment thereof, and their performance of and reliance upon an impermissible and unauthorized audit of Mayo's hospital charges, constitutes a breach of KPG, the Plan and GPA's covenant of good faith and fair dealing with respect to Mayo.

*Against MultiPlan*

68. MultiPlan's failure to contract with GPA in accordance with the terms of the Agreement, and its allowing GPA and the Plan's access to Mayo for physician services only, constitutes a breach of the covenant of good faith and fair dealing.

69. All Defendants acted with the intention of Mayo being underpaid for the valuable health care goods and services it provided to Kittle.

70. As a result of Defendants' breach of the covenant of good faith and fair dealing, Mayo has and will incur damages in the amount of $233,397.63.

## CLAIM III
## COMMON LAW FRAUD

71. Plaintiff incorporates each and every allegation contained in Paragraphs 1-70, inclusive, with the same force and effect as if fully set forth herein.

*Against Kittle*

72. Prior to receiving health care goods and services, Kittle signed the Authorization wherein he represented and agreed that he was "responsible for all charges for services provided, including any amount not paid by [his] health care plan(s) . . . ."

73. Kittle signed this Authorization, guaranteeing his payment and personal obligation to Mayo for the health care goods and services he was to receive, with the knowledge that his representation was false, as the Plan would significantly underpay Mayo for the health care goods and services provided to him, that as a result of the Plan's underpayment he would incur a large patient liability balance, and that ELAP and GPA would then arrange for his legal representation to dispute the bill due and owing to Mayo.

74. Kittle signed the Authorization promising to pay, again with the knowledge that this representation was false as he had no intention to pay.

75. Kittle's representation that he would pay Mayo, when he knew he had no such intention, concerned a material fact regarding the bargain between the parties, and was made by Kittle personally as an individual who knew of its falsity.

76. Kittle signed the Authorization promising to pay in order to induce Mayo to provide him with the health care goods and services he specifically sought out and requested from it.

13

77. Mayo relied on Kittle's promise and representation that he would pay for all charges associated with the health care goods and services provided to him that were not paid for by the Plan when it agreed to and did provide health care goods and services to him.

78. Mayo has suffered damages in the amount of $233,397.63 based upon its reliance on Kittle's representation that he would pay Mayo for the health care goods and services he was provided, as Mayo has gone unpaid for the same.

## CLAIM IV
## EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")
### 29 U.S.C. § 1001 *et. seq.*
*(Pled in the Alternative)*

79. Plaintiff incorporates each and every allegation contained in Paragraphs 1-78, inclusive, with the same force and effect as if fully set forth herein.

80. The Plan is, upon information and belief, part of a health and welfare benefit plan that is governed by the ERISA.

81. KPG, the Plan and GPA have failed to comply with the terms of the Plan by failing to make payment to Mayo of the benefits due under the Plan in accordance with the Agreement.

82. Mayo brings this action alternatively pursuant to 29 U.S.C. § 1132, as a beneficiary and assignee of Kittle's health benefits, to enforce the terms of the Plan.

83. As a result of KPG, the Plan and GPA's failure to pay Mayo the benefits due under the Plan in accordance with the Agreement, Plaintiff is entitled to damages pursuant to 29 U.S.C. § 1132(a)(1)(B) in an amount in excess of $233,397.63, plus reasonable attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1), from KPG, the Plan and GPA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendants:

1. For an award of damages in an amount in excess of $233,397.63, plus any and all pre and post-judgment interest pursuant to Defendants' breach of contract, breach of the covenant of good faith and fair dealing, Defendant Kittle's fraud, or alternatively, pursuant to 29 U.S.C. § 1132(a)(1)(B).

2. For an award of reasonable attorneys' fees against Defendants pursuant to 29 U.S.C. § 1132(g)(1) if alternate relief is granted.

3. For such other relief as the Court deems just and equitable.

Dated: April 22, 2021          **D.S. ERICKSON & ASSOCIATES, PLLC**

By _s/ Timothy J. Henkel_
Timothy J. Henkel (#0389403)
Gregory Hanson (#0395404)
7650 Edinborough Way, Suite 500
Edina, MN 55435
Phone:    (612) 333-7600
Facsimile:  (612) 333-7611
Email:     timothy.henkel@dserickson.com
             gregory.hanson@dserickson.com
ATTORNEYS FOR PLAINTIFF
MAYO CLINIC